IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IHFC PROPERTIES, LLC,            )
                                 )
            Plaintiff,           )
                                 )
      v.                         )      1:10cv568
                                 )
APA MARKETING, INC., and         )
WHALEN FURNITURE                 )
MANUFACTURING, INC.,             )
                                 )
            Defendants.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Plaintiff IHFC Properties, LLC ("IHFC"), brings this action against Defendants APA Marketing, Inc., and Whalen Furniture Manufacturing, Inc. ("Whalen"), for damages arising out of the use of one of IHFC's furniture showrooms.[1] IHFC originally filed this action in the General Court of Justice, Superior Court Division, of Guilford County, North Carolina, alleging breach of lease, future rent, and, in the alternative, Whalen's responsibility for lease payments pursuant to doctrines of mere continuation or *de facto* merger. (Doc. 3.) Whalen timely removed the action to this court on the ground of diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332(a) and 1441(b). (Doc. 1.) Whalen then moved to dismiss the case for improper

---

[1] Because of the potential for confusion between APA Marketing, Inc., the company, and APA Marketing, the brand and later the division of Defendant Whalen, the court will always refer to the company by its full name.

venue, or in the alternative, to transfer it. (Doc. 13.) Upon Recommendation of the United States Magistrate Judge, (Doc. 24); IHFC Props., LLC v. APA Mktg., Inc., No. 1:10CV568, 2011 WL 7423427 (M.D.N.C. July 12, 2011), this court found that venue was proper and, determining that Whalen was substantively (though not formally) challenging personal jurisdiction, found that IHFC had made a *prima facie* showing of this court's personal jurisdiction sufficient to survive a motion to dismiss, (Doc. 31); IHFC Props., LLC v. APA Mktg., Inc., 850 F. Supp. 2d 604 (M.D.N.C. 2012).

APA Marketing, Inc., moved to relieve its counsel of further obligation in the action, acknowledging that the withdrawal may result in the entry of default judgment against it. (Doc. 42.) This court granted the motion (Doc. 50), and APA Marketing, Inc., has not appeared further in the case.

IHFC's claims against the only other defendant, Whalen, were tried to the court on October 7, 8, and 9, 2013. At trial, IHFC presented three live witnesses: Thomas Loney, IHFC's vice president of leasing during the dispute; Tom Mitchell, IHFC's president and Chief Executive Officer; and Ed Thomas, IHFC's then chief financial officer. IHFC also presented one witness by deposition: Al Schwerin, a co-founder, director, and shareholder of APA Marketing, Inc., who became an employee of Whalen.

At the close of IHFC's evidence, Whalen moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c),[2] which the court took under advisement. Whalen then presented three live witnesses: Ken Whalen, Whalen's founder and president; Lisa Johnson, IHFC's lease administrator; and Paul Coscarelli, a co-founder, director, and shareholder of APA Marketing, Inc., who, like Schwerin, became an employee of Whalen. Whalen also presented two witnesses by deposition: Al Schwerin and Ed Thomas.

Pursuant to Federal Rule of Civil Procedure 52(a), the court enters the following findings of fact and conclusions of law. To the extent any factual statement is contained in the conclusions of law, it is deemed a finding of fact as well.

## I.  FINDINGS OF FACT

The court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the court has found reasonable to draw from the evidence.

1.  Plaintiff IHFC is a Delaware limited liability company authorized to transact business in the State of North Carolina. It maintains offices and has its principal place of business in High Point, North Carolina. IHFC is owned by IHFC Holdings,

---

[2] Before trial, Whalen submitted a written brief in support of its Rule 52(c) motion (Doc. 53) and then orally argued the motion at trial.

LLC, which is owned by International Home Furnishings Center, Inc. IHFC owns and manages the real estate for its parent company, including showroom buildings in High Point, North Carolina, that are utilized by vendors exhibiting furniture at the biannual furniture market in High Point.

2. Defendant APA Marketing, Inc., was a corporation organized and existing under the laws of the State of California and maintained offices in Monument, Colorado, and Henderson, Nevada. APA Marketing, Inc., imported casual dining and entertainment furniture for retail. It formally dissolved after the principal events at issue in this litigation.[3]

3. Defendant Whalen is a corporation organized and existing under the laws of the State of California, having its principal place of business in San Diego, California. Whalen imports and manufactures furniture for retail sale.

4. On November 16, 2006, IHFC and APA Marketing, Inc., entered into a five-year lease agreement for one of IHFC's High Point showrooms ("the IHFC Lease" or "the Lease"). (Plaintiff ("Pl.") Ex. 1.) The Lease provided APA Marketing, Inc., the right to 15,005 square feet of showroom space at $14.50 per square foot, was backdated to November 1, 2006, and ran until October 14, 2011.

---

[3] On January 13, 2013, Schwerin stated in his deposition that the formal dissolution of APA Marketing, Inc., was "probably" in the last year, i.e. sometime during 2012. (Schwerin Dep. 114:9-16.)

5. The annual rent for the showroom was to be paid in equal installments due on May 1 and November 1 of each year to reflect the twice-yearly High Point furniture market occurring each mid-April and mid-October. Therefore, the May 1 rent installment covered the six-month period from May 1 to October 31, including the October market, and the November 1 rent installment covered the six-month period from November 1 to April 30, including the April market.

6. Al Schwerin and Paul Coscarelli were the co-founders and co-owners of APA Marketing, Inc. They owned equal one-half shares in the corporation. Coscarelli signed the IHFC lease on behalf of APA Marketing, Inc.

7. APA Marketing, Inc., shared the IHFC showroom space with Ultimate Accents, Inc. ("Ultimate"). Ultimate also imported furniture, but specialized in accent pieces, such as credenzas and end tables. (Schwerin Dep. 13:8-22.) Ultimate had three owners: Gail Steele, president; Coscarelli, chief financial officer; and Schwerin, board member.[4] Because of the common ownership of APA Marketing, Inc., and Ultimate, IHFC agreed to allow the two companies to combine their showroom space under the Lease. By doing so, APA Marketing, Inc., and

---

[4] There was some evidence suggesting that Ray Steele, Gail Steele's husband, also had part ownership of Ultimate, but both Schwerin and Coscarelli testified that Ultimate had only three owners (Schwerin, Coscarelli, and Gail Steele) and that their ownership interests were equal one-third shares.

Ultimate benefitted from a lower per-square-foot rate than they would have paid had each leased from IHFC separately. Under this arrangement, APA Marketing, Inc., occupied approximately 10,000 square feet of the showroom space and Ultimate occupied the remaining approximately 5,000 square feet. APA Marketing, Inc., was the only lessee on the Lease, however. IHFC, Ultimate, and APA Marketing, Inc., had only a verbal agreement as to Ultimate's use of the space.

8. Typically, when IHFC approves a sublease, it requires that the sublessee pay rent directly to IHFC instead of to the lessee. IHFC has this policy to ensure that it collects any excess rent a lessee charges a sublessee. In Ultimate's case, however, Thomas Loney, IHFC's vice president of leasing, testified that he did not consider Ultimate to be a sublessee. Instead, IHFC invoiced APA Marketing, Inc., for the total rent due each cycle. APA Marketing, Inc., in turn, collected Ultimate's share of the rent and forwarded it, along with APA Marketing, Inc.'s share, to IHFC.[5]

9. APA Marketing, Inc., occupied the showroom space and paid rent without incident from 2006 through 2007. On April 1, 2008, IHFC billed APA Marketing, Inc., for the upcoming

---

[5] Although there was some suggestion that Ultimate made at least some payments directly to IHFC, Loney testified that IHFC's records show that APA Marketing, Inc., paid the whole rent to IHFC and turned to Ultimate for its share. Coscarelli agreed that all of Ultimate's rent payments were made to APA Marketing, Inc., not to IHFC. There was no evidence of any direct payments from Ultimate to IHFC.

6

$124,409.58 rent due May 1, 2008 (Pl. Ex. 2), but May 1 passed without payment. On July 25 and August 6, 2008, APA Marketing, Inc., submitted late, partial payments of $24,409.58 and $25,354.42, respectively. Both checks reflected only the payments by Ultimate for its share of the rent obligation.

10. Unknown to IHFC at the time, APA Marketing, Inc., had entered into negotiations in early 2008 to sell its assets to Whalen. On July 10, 2008, APA Marketing, Inc., and Whalen signed an asset purchase agreement ("the Purchase Agreement"). (Pl. Ex. 6.) Schwerin and Coscarelli each signed on behalf of APA Marketing, Inc.; Ken Whalen,[6] founder and president of Whalen, signed on behalf of Whalen. Because the Purchase Agreement required a valuation of APA Marketing, Inc.'s assets, the sale was not consummated until September 1. Ultimately, Whalen paid $3.5 million for APA Marketing, Inc.'s assets.

11. As part of the Purchase Agreement, Whalen agreed to enter into employment contracts with Schwerin and Coscarelli, and both became Whalen employees after the Purchase Agreement was signed.[7] Coscarelli remains a Whalen employee; Schwerin left Whalen in April 2012.

---

[6] Because of the potential for confusion between Ken Whalen, the individual, and Whalen, the company, the court will always refer to the former using his full name.

[7] Schwerin's employment agreement states that his employment was effective August 1, 2008. (Schwerin Dep. Ex. 14.)

12.  The Purchase Agreement was admitted into evidence at trial, and precisely what it covers – more specifically, whether it covers the IHFC Lease - is a major disputed issue in this litigation.  Therefore, its provisions will not be detailed here, but will instead be addressed as relevant to the legal analysis.  It is undisputed, however, that Whalen acquired significant assets in the form of inventory, as well as three trade names ("APA Marketing," "Encore Home Entertainment," and "Entrée Casual Dining") and all leases and subleases[8] at APA Marketing, Inc.'s facility in Henderson, Nevada.  "APA Marketing" became a wholly-owned division of Whalen.  APA Marketing, Inc., transferred all of its customers and customer lists to Whalen and, sometime after the Purchase Agreement, Whalen began selling APA Marketing, Inc., products under the name "APA by Whalen."

13.  APA Marketing, Inc., continued to exist after the Purchase Agreement, but it had no product, no customers, and no ability to use its own trade name, as Whalen had purchased the exclusive right to use the name "APA Marketing."  APA Marketing, Inc., also had no need for the IHFC showroom at the October 2008 market or for any market thereafter because it had no more product to sell.

---

[8] Whalen acquired as a lessee the lease from APA Properties, Inc., to APA Marketing, Inc.; it acquired as a sublessor the subleases from APA Marketing, Inc., to various small vendors.

14. After the Purchase Agreement, APA Marketing, Inc.'s only purpose was to collect its accounts receivable of approximately $2.9 million. Its liabilities disclosed in connection with the Purchase Agreement exceeded that amount. The IHFC Lease was only booked as a liability when the rent became due, so at the time of the Purchase Agreement, most of the future rent due was not reflected on APA Marketing, Inc.'s books. There was no evidence as to how APA Marketing, Inc., used the $3.5 million it acquired from Whalen in the Purchase Agreement.

15. During the summer of 2008, Loney was in regular contact with Coscarelli because of the late rent (due May 1, 2008). In August, after Loney had received the partial payments on the late rent, Coscarelli informed Loney that APA Marketing, Inc., was close to a deal with another company that would resolve its financial difficulties. In early September, after the Purchase Agreement had been consummated, Coscarelli called Loney and said that APA Marketing, Inc., had been sold to Whalen. He informed Loney that IHFC would be getting the remainder of the rent payments for the October 2008 market and that Loney should contact Ken Whalen about the rent. Coscarelli gave Loney Ken Whalen's phone number.[9]

---

[9] Coscarelli offered a different version of events in his trial testimony. He stated he did not recall any conversations with Loney

16.  At trial, the parties disputed the conversation that followed.  According to Loney's trial testimony, he called Ken Whalen shortly after speaking with Coscarelli and congratulated him on the purchase of APA Marketing, Inc.  Loney reviewed the terms of the IHFC Lease with him, including the length of the lease and the timing of the rent payments.  Loney informed him about the late rental obligation, and Ken Whalen stated he would "get the rent payment right out to [IHFC.]"  Ken Whalen confirmed that Whalen would be responsible for the Lease.  Loney told him that he would send the standard "Consent to Assignment of Lease" form.  Ken Whalen, on the other hand, testified that he did not recall any conversation with Loney during 2008 and stated that Loney never advised him of any terms of a lease between APA Marketing, Inc., and IHFC.

17.  The court credits Loney's testimony and finds that he spoke with Ken Whalen in early September, brought up the issue of the IHFC Lease, and stated that he understood that Whalen had purchased APA Marketing, Inc.  The court finds further that Ken Whalen acknowledged that a sale had occurred in connection with APA Marketing, Inc.,[10] and told Loney that Whalen would now be

---

about APA Marketing, Inc.'s rent before the Purchase Agreement was executed.  He further testified he did not have any conversation about Ken Whalen with Loney after the Purchase Agreement was executed.  The court credits the other evidence, including Loney's testimony, over Coscarelli's testimony on this point.

[10]  There was some dispute at trial whether Loney had understood from Coscarelli that Whalen had purchased APA Marketing, Inc., and not just

responsible for payments under the Lease.  The court also finds that Loney informed Ken Whalen of the late rent obligation and stated that he would send the "Consent to Assignment of Lease" form shortly.  Ken Whalen acceded to the consent form being sent and told Loney he would "take care of" the rent obligation. Although Loney did not discuss in detail the terms of the Lease or send a copy of it to Ken Whalen, the court credits Loney's testimony that he informed Ken Whalen of the amount of rent to be paid, the dates payment was due, and the term of the Lease.

18.  On September 11, 2008, Loney mailed to Ken Whalen IHFC's standard "Consent to Assignment of Lease" and requested that he sign on behalf of Whalen and return it.  (Defense ("Def.") Ex. DX37.)[11]  Ken Whalen did not sign or return the document, nor did he reject it.

19.  On September 26, 2008, Whalen issued a check for the remaining $74,645.58 balance of rent owed to IHFC under the IHFC Lease for the October 2008 market.  (Pl. Ex. 3.)

---

its assets.  The distinction is not important here, as Ken Whalen represented that Whalen would be responsible for the payments under the Lease in any event.

[11] Whalen's exhibits were not re-numbered when they were admitted at trial, so they retain the designation Whalen gave them after discovery.  The court considers only the exhibits actually admitted, however, so there are gaps in their numbering.

20.  The fall furniture market took place in mid-October 2008.[12]  At that time, Whalen used the IHFC Lease space as if it were its own.[13]  Whalen owned the entire inventory in the showroom, which was run by Whalen employees, namely Schwerin and Coscarelli.  The inventory was shown and sold under the trade name "APA Marketing," which was owned by Whalen, or under the trade name "APA by Whalen."  And all revenues and profits from the sale of inventory displayed were collected by Whalen.

21.  At the October 2008 market, Ultimate continued to use its own space, which had a separate entrance, and continued to show its own inventory, which was not owned by Whalen.

22.  On November 1, 2008, the next rental payment under the IHFC Lease became due.  As usual, IHFC had issued its bill thirty days in advance.[14]  (Pl. Ex. 4.)  The rent obligation was

---

[12] At trial, Loney recounted an October 2008 meeting with Ken Whalen, which had been arranged by Coscarelli and Schwerin, in which the group discussed potential spaces for the rest of Whalen's brands at IHFC. Coscarelli and Schwerin do not mention this meeting specifically, instead focusing on the April 2009 meeting on the same subject.  Ken Whalen testified that he never met Loney before the April 2009 market. Ultimately, whether this meeting occurred is not significant to the legal analysis because, even if it occurred, it only concerned negotiations for additional space, not discussions of the existing space.

[13] Ken Whalen testified that there was some discontinued inventory in the showroom that Whalen had not acquired and that APA Marketing, Inc., was continuing to sell on its own behalf, but both Schwerin and Coscarelli testified that the entire inventory in the showroom belonged to Whalen and that APA Marketing, Inc., had no more product to sell.  The court credits Schwerin and Coscarelli on this point.

[14] IHFC's records were apparently not changed from their original set up to issue the invoice to APA Marketing, Inc.'s address on file.

$119,430.41 and covered the six-month period from November 1 to April 30, including the April 2009 market.

23. On November 10, 2008, Loney issued a late rent notice to APA Marketing, Inc., addressed to Coscarelli. (Def. Ex. DX48.)

24. On November 14, 2008, Whalen issued a check made payable to IHFC for the whole rent obligation: $119,430.41.[15] (Pl. Ex. 5.) Apparently IHFC had not received the check by November 19, 2008, when Loney issued another late rent notice to APA Marketing, Inc., addressed to Coscarelli. (Def. Ex. DX49.) On December 18, 2008, Loney resent the "Consent to Assignment of Lease" form to Ken Whalen and requested again that he sign and return it. (Def. Ex. DX38.) Ken Whalen never executed or returned it, nor did he ever inform IHFC that he rejected it. The parties did not communicate further about the Lease space until just before the spring 2009 market.

25. The spring furniture market took place in mid-April 2009. At that time, Whalen again occupied the Lease space as if it were its own. The entire inventory in the showroom space was owned by Whalen, and the showroom was run by Whalen employees, namely Schwerin and Coscarelli. All inventory was shown and sold under the trade name "APA Marketing," which was owned by

---

[15] There was no evidence as to whether Ultimate paid its share of the rent or, if it did, to whom. Whalen's check covered the whole rent, including Ultimate's share.

Whalen, or under the trade name "APA by Whalen." And all revenues and profits from the sale of inventory displayed were collected by Whalen.

26. At the April 2009 market, Loney met Ken Whalen, Schwerin, and Coscarelli at Center Point, a furniture exhibition building not owned by IHFC but where Whalen had a lease for its other brands that pre-dated its purchase of the APA Marketing brand. The purpose of the meeting was to discuss Whalen's interest in considering options to consolidate its showroom space. One option Whalen noted was to relocate its goods to a different showroom building in High Point - possibly IHFC's - when Whalen's lease with Center Point expired. The participants discussed IHFC rental rates, and Loney informed them that if Whalen combined the square footage it was using at the IHFC space with the square footage it would need to accommodate its brands at Center Point, IHFC would consider it a "major tenant" that would be eligible for a reduced per-square-foot rent rate. At the end of the meeting, Ken Whalen advised Loney that it was unlikely he would be relocating his other brands to IHFC.

27. Although someone at IHFC had *intended* that Loney get the "Consent to Assignment of Lease" form signed at the April 2009 market (Def. Ex. DX38 (handwritten notation "TJL [Thomas J.

14

Loney] to get signed at mkt [market]")[16]), Loney did not ask Ken Whalen to do so. Rather, Loney's focus was on attracting Whalen's other brands to IHFC. Neither Loney, Schwerin, nor Coscarelli, all of whom were present at the meeting, described any attempt by Loney to get the assignment consent form signed at that time. Nor was there any evidence, however, that anyone told Loney that Whalen would not consent to the requested assignment.[17]

28. No one mentioned to Loney during the April 2009 market that Whalen was considering removing its inventory from the IHFC showroom or that Whalen considered its use of the showroom to be only temporary. The court finds Ken Whalen's testimony to the contrary inconsistent with the weight of the evidence and not credible. In fact, Whalen did not inform IHFC of its intention to vacate the showroom until late summer 2009.

29. On May 1, 2009, the next rental payment under the IHFC Lease became due. The rent obligation due was $135,046.69 and covered the six-month period from May 1 to November 30, including the October 2009 market. (See Pl. Ex. 11.) Neither APA Marketing, Inc., nor Whalen made any payment toward that rent obligation, so IHFC issued a bill to APA Marketing, Inc.,

---

[16] Loney did not write the notation himself.

[17] To the extent Ken Whalen's testimony was inconsistent with this, the court discounts it.

for a late penalty on July 22, 2009. (Pl. Ex. 14.) The late penalty was $6,752.45.

30. In July 2009, Schwerin called Loney to arrange a private showing of Whalen's products housed at the IHFC Lease showroom for Macy's, a Whalen customer, on July 20.

31. IHFC keeps all its buildings and showrooms locked between markets. Only tenants enjoy the right to have the buildings opened for non-market use, such as private showings. A tenant who needs to have the building unlocked must call Loney, who arranges for it to be opened. Additionally, IHFC does not maintain the lights or air-conditioning during non-market times. The IHFC Lease specifically states that IHFC is responsible for providing heat, electricity, air-conditioning, and elevator service for the thirty days before market and fourteen days after market, but that tenants are responsible for any utility costs incurred during non-market use of the showroom. (Pl. Ex. 1.)

32. Therefore, when Schwerin requested the private showing for Macy's, he had to ask Loney to arrange to have the building and showroom opened and the lights and air-conditioning turned on. (Schwerin Dep. 64:22-65:7.) While tenants were not given keys to the building, Schwerin could not even open up the showroom himself because the key Whalen used was with a third party. Loney agreed to Schwerin's requests, and the Macy's

16

private showing went forward as planned. Although no sales resulted from the private showing, Macy's was an important customer for Whalen, and both Schwerin and the Macy's representatives flew into High Point specifically to attend this event. (Id. at 66:1-67:5.)

33. In late July 2009, after the Macy's private showing, Whalen entered into a new lease with Center Point for an additional 14,550 square feet. (Pl. Ex. 13.) That additional space was intended to and did house the product that Whalen had acquired from APA Marketing, Inc., that Whalen had been showing in the IHFC Lease showroom up to that time.

34. In late July or early August 2009, after the Macy's private showing, Coscarelli called Loney and informed him that Whalen would be vacating the space at the IHFC showroom and moving its inventory to Center Point. Loney reminded him that there were three years remaining on the Lease. Coscarelli responded that Loney should take it up with Ken Whalen. Loney advised that IHFC would not allow the product to leave the building.

35. Pursuant to the Lease terms, IHFC kept the building and showroom locked. As a consequence, Whalen could not remove its product to relocate to Center Point. On August 18, 2009, IHFC's counsel, in an apparent response to threats of legal action, wrote to Whalen's counsel to inform him that he had

17

instructed IHFC to release the contents of the showroom, but that if Whalen and APA Marketing did not negotiate a lease termination or a new lease, IHFC would pursue legal action against Whalen and APA Marketing "for the rent reserved under the existing lease with IHFC." (Def. Ex. DX27.)

36. Whalen vacated the showroom in August 2009, and IHFC attempted to find new tenants to mitigate its damages. Because of the late notice, IHFC had only about six weeks to find a tenant before the mid-October market. As a further complication, tenants need time to prepare their showrooms before market. They usually have to develop the showroom space to fit their needs, which requires significant design planning and construction. Tenants often demolish and rebuild interior walls, rearrange lighting, create office space, and treat the floors, all of which may require a building permit. The cost of preparing a showroom ranges from $5 to $20 per square foot. Additionally, IHFC requires all of its tenants to have their construction completed thirty days before market. Finding tenants who would agree to a lease only six weeks before market under these circumstances, therefore, was a nearly impossible task.

37. Loney first approached Ultimate about signing a new lease for its share of the showroom, since Ultimate had already been using the space through the IHFC Lease. On August 27,

2009, Ultimate signed a lease with IHFC for 5,400 square feet. (Pl. Ex. 7.) The cost per square foot escalated over the term of the five-year lease, so that Ultimate paid $16 per square foot in the first year and an additional $2 per square foot each succeeding year. Per IHFC policy, the lease was backdated to the beginning of the applicable rent cycle, which in this case was May 1, 2009.

38. Loney then approached Red Dog Furniture Company ("Red Dog") about leasing the remaining showroom space. Because of the last-minute nature of the deal, Red Dog only agreed to lease the space for one market and for a significantly reduced price. On September 25, 2009, Red Dog signed a lease for the remaining 9,605 square feet for the October 2009 market for $15,000. (Pl. Ex. 8.) Again, the lease was backdated to May 1, 2009.

39. IHFC's loss for the October 2009 market (rent cycle May 1, 2009, to October 31, 2009) that it was unable to mitigate was $76,441.69.

40. Because Red Dog had only leased the space for one market, Loney had to search out a new long-term tenant for the 9,605 square feet of IHFC Lease space not re-leased to Ultimate. After the October 2009 market, Loney was able to sign Heritage Brands to a lease for the next two markets. Heritage Brands was a new company and a division of Intercon, Inc. ("Intercon"). Because it was a new company, Heritage would not sign a lease

19

for longer than one year. It leased the 9,605 square feet of showroom space from November 1, 2009, to October 31, 2010; the rent obligation was $26,250 for the April 2010 market and $45,000 for the October 2010 market. (Pl. Ex. 9.) IHFC leased the space to Heritage Brands at a lower price for the April 2010 market because, as a new company, Heritage Brands did not have sufficient product to occupy the whole space and could not afford to lease it at full price.[18]

41. IHFC's loss for the April 2010 market (rent cycle November 1, 2009, to April 30, 2010) that it was unable to mitigate was $49,575.42. IHFC's loss for the October 2010 market (rent cycle May 1, 2010, to October 31, 2010) that it was unable to mitigate was $38,308.47.

42. After the October 2010 market, IHFC was again without a tenant for the 9,605 square feet of showroom space under the IHFC Lease. This time, however, IHFC was able to secure a long-term tenant for all of the 9,605 square feet, plus additional adjacent space. On February 23, 2011, Intercon signed a lease for 16,038 square feet (including the space formerly used by APA Marketing, Inc., under the IHFC Lease) at $15 per square foot. (Pl. Ex. 10.) The lease term began on November 1, 2010, and runs until October 31, 2015.

---

[18] The October 2010 rent for Heritage Brands was still considerably lower than what IHFC usually charged tenants because IHFC had to bargain to get a tenant who would pay for the space, even if not at full market price.

43.   IHFC did not have any loss for the April 2011 market (rent cycle November 1, 2010, to April 30, 2011) that it was unable to mitigate.   Instead, it recovered an additional $2,476.08.   IHFC's loss for the October 2011 market (rent cycle May 1, 2011, to October 31, 2011) that it was unable to mitigate was $10,621.01.

44.   IHFC's total unmitigated loss for the IHFC Lease is therefore $172,470.51.

45.   IHFC filed this lawsuit on June 22, 2010.   (Doc. 3.) Sometime after that date, APA Marketing, Inc., and Whalen executed an addendum to the Purchase Agreement.   (Def. Ex. DX24.)   The addendum is undated, but the parties agree it was not signed until after litigation commenced.   Coscarelli signed on behalf of APA Marketing, Inc., and Ken Whalen signed on behalf of Whalen.   The addendum purports to clarify perceived ambiguities in the Purchase Agreement and specifically amends the Purchase Agreement to exclude the IHFC Lease from the assets purchased by Whalen.

## II.   CONCLUSIONS OF LAW

1.   This court's subject matter jurisdiction arises pursuant to 28 U.S.C. § 1332(a).   Plaintiff IHFC is a Delaware corporation with its principal place of business in North Carolina.   Defendants APA Marketing, Inc., and Whalen are California corporations with their principal places of business

in Nevada[19] and California, respectively. The parties are therefore completely diverse. In its complaint, IHFC alleged losses of $164,327.96, not including interest and attorney's fees. The amount in controversy therefore exceeds $75,000.

2. Venue is proper pursuant to 28 U.S.C. § 1441(a), which permits removal only "to the district court of the United States for the district and division embracing the place where the action is pending." See also (Doc. 31); IHFC Props., 850 F. Supp. 2d at 613.

3. Personal jurisdiction over both Defendants is proper pursuant to N.C. Gen. Stat. § 1-75.4 and is constitutionally proper.

### A. Purchase Agreement

4. A primary question in this dispute is whether the Purchase Agreement transferred the obligations under IHFC Lease from APA Marketing, Inc., to Whalen. IHFC argues that it does and that Whalen is therefore bound by all terms of the full IHFC Lease; Whalen contends it does not and that it is not bound by any term of the Lease. The parties agree that California law governs this question, as the Purchase Agreement was made between two California corporations and includes a choice-of-law

---

[19] Whether APA Marketing, Inc.'s principal place of business is in Nevada, where it had offices and its principal facilities and warehouses, or in California, where Whalen alleges its principal place of business (Doc. 1), is not important for the jurisdictional analysis. Either way, Defendants are completely diverse from Plaintiff.

22

provision, which stipulates that it should be governed by California law. (Pl. Ex. 6 at B.12.g.)

5. Under California law, "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." State v. Continental Ins. Co., 281 P.3d 1000, 1004 (Cal. 2012) (citations omitted). The parties' intent should be inferred from the written language of the contract. Id. "If contractual language is clear and explicit, it governs." Id. (citation omitted).

6. Both parties argue that the contractual language is clear, but in its favor. IHFC asserts that, under the Purchase Agreement, Whalen acquired "Purchased Assets" from APA Marketing, Inc., and that "Purchased Assets" is defined as all "Assets." (Pl. Ex. 6 at B.2.a.i., B.1.q.) "Assets" are "all assets and properties owned, used, or leased or subleased by [APA Marketing, Inc.,] in connection with the Business (other than the Excluded Assets), including [non-exhaustive list]." (Id. at B.1.b.) The IHFC lease is not listed as an "Excluded Asset." (Id. at B.1.l., Schedule 1(p).) IHFC therefore interprets the contract to include the IHFC Lease as a Purchased Asset.

7. Whalen, on the other hand, asserts that the IHFC Lease is a liability, not an asset. The Purchase Agreement states that Whalen "shall not assume . . . any and all liabilities and

23

obligations of [APA Marketing, Inc.,]" except as "specifically provided" in the Purchase Agreement. (Id. at B.2.d.) Because the IHFC Lease is not specifically assumed, Whalen argues, the Purchase Agreement excludes it. Whalen further argues that the IHFC Lease is not specifically listed as a "Purchased Asset" in Schedule 1(b). Whalen therefore interprets the contract to exclude the IHFC Lease as a liability.

8. There is authority that a lease can be both an asset and a liability. The right to occupy the leased property, as well as the other rights that a tenant enjoys under a lease, can be assets. The obligation to pay rent is a liability. California courts sometimes refer to tenants' leases as assets and sometimes as liabilities, depending on the context. See, e.g., Airport Plaza, Inc. v. Blanchard, 234 Cal. Rptr. 198, 199 (Ct. App. 1987) ("Airport Plaza [lessee] also wished to dissolve the corporation and assign its assets, including the lease, to its two shareholders."); Chesapeake Indus., Inc. v. Togova Enter., Inc., 197 Cal. Rptr. 348, 354 (Ct. App. 1983) ("[Lessor] . . . was the only party in possession of the data required to determine the extent of Chesapeake's [tenant's] liability under the lease."). Neither party in this case has directed the court to any California authority that conclusively establishes

24

whether a lease is an asset or a liability, probably because it
is the nature of a lease that it includes elements of both.[20]

9.    The Purchase Agreement does not reference the IHFC
Lease specifically, and it has conflicting provisions.  Section
B.1.b. can be read to indicate that Whalen acquired the Lease,[21]
while section B.2.d. can be read to indicate that Whalen did not
acquire it.   The written terms of the Purchase Agreement are
therefore ambiguous as to whether Whalen assumed the IHFC Lease.

10.   Where contractual language is ambiguous, a court may
consider extrinsic evidence to determine its meaning.   It is a

---

[20] Both Ken Whalen and Coscarelli testified that they understood the
IHFC Lease to be a liability, but the court does not find that
testimony to be particularly persuasive, given the self-serving nature
of the testimony and the admission by both Coscarelli and Schwerin
that the IHFC Lease also had significant benefits.   As this court
pointed out its prior opinion in this case, a factfinder is entitled
to reject self-serving statements, even if uncontradicted.   (Doc. 31);
IHFC Props., 850 F. Supp. 2d at 621 (citing People v. $9,632.50 U.S.
Currency, 75 Cal. Rptr. 2d 125, (Ct. App. 1998); People v. Jerry
Z, 133 Cal. Rptr. 3d 696, 716 (Ct. App. 2011)).

[21] The court is not persuaded by Whalen's argument that this subsection
extends only to properties for which APA Marketing, Inc., was the
lessor, not the lessee.   First, Whalen premises its argument on the
preposition "by," asserting that, had the definition stated
"properties leased to [APA Marketing, Inc.]," it would have included
properties for which APA Marketing, Inc., was the lessee, but because
it stated "properties leased by [APA Marketing, Inc.]," it only
includes property for which APA Marketing, Inc., was the lessor.   Yet,
California courts routinely refer to "[property] leased by [tenant]."
See, e.g., Plumbers and Steamfitters, Local 290 v. Duncan, 69 Cal.
Rptr. 3d 184, 190-91 (Ct. App. 2007); Dubin v. Robert Newhall
Chesebrough Trust, 116 Cal. Rptr. 2d 872, 876 (Ct. App. 2002).
Whalen's parsing of prepositions does not limit the sweeping language
of the "Assets" definition.   Second, Whalen indisputably acquired APA
Marketing, Inc.'s interests in the property at Conestoga Way in
Henderson, Nevada, for which APA Marketing, Inc., was both a lessee
(from APA Properties, Inc.) and a sublessor (to various small
vendors).   The language of the "Assets" definition therefore included
properties for which APA Marketing, Inc., was a lessee.

25

"cardinal rule of construction that when a contract is ambiguous or uncertain the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties." Sterling v. Taylor, 152 P.3d 420, 429 (Cal. 2007); see also City of Hope Nat'l Med. Ctr. v. Genentech, Inc., 181 P.3d 142, 155 (Cal. 2008); Tanner v. Title Ins. & Trust Co., 129 P.2d 383, 388 (Cal. 1942). A court should consider the "objective manifestations of the parties' intent," including "the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." People v. Shelton, 125 P.3d 290, 294 (Cal. 2006).

11. The nature of the Purchase Agreement was a sale of essentially all of APA Marketing, Inc.'s assets such that APA Marketing, Inc., was no longer an operational business after the sale. The company's only purpose was to collect its retained accounts receivable, which amounted to $2.9 million, even though its liabilities exceeded that amount. The company had insufficient funds for, and no practical intention of, carrying on its business. Its two sole shareholders, officers, and directors had both been retained by Whalen as employees, and it had sold all its inventory, trade names, and customer lists to Whalen.

26

12. Pursuant to the Purchase Agreement, APA Marketing, Inc.'s assets were valued between the time it was signed on July 10, 2008, and executed on September 1, 2008. Neither party produced any evidence of how they were categorized or valued. Importantly, there was no evidence that the IHFC Lease was valued or even discussed by the parties at the time. Whalen did provide its corporate loan agreement with Union Bank of California, which was renegotiated to reflect the asset sale, and the IHFC Lease does not appear in the loan agreement, even though Whalen's other acquired properties do. (Def. Ex. DX262.)

13. After the asset sale, APA Marketing, Inc., behaved as if it had no further obligation under the IHFC Lease and as if Whalen would assume its obligations. For example, when asked about the late rent for the October 2008 market, Coscarelli told Loney to take it up with Ken Whalen. Schwerin also told Coscarelli not to pay any more invoices for APA Marketing, Inc. Coscarelli warned Ken Whalen that if he wanted to have some place to show the Whalen-owned furniture for the October 2008 and April 2009 markets, he would need to pay the IHFC rent obligation. All of these actions indicate that APA Marketing, Inc., had no need for the Lease benefits, never intended to shoulder its Lease obligations, and expected Whalen to assume both the benefits and the obligations of the Lease.

14.  Whalen's conduct after the asset sale, however, is contradictory.  While Whalen never signed a "Consent to Assignment of Lease" form, even though Loney sent it twice, it (through Ken Whalen) acknowledged to Loney it would make the payments due under the Lease, directly paid IHFC for two rent cycles, used the Lease space, and acted as a tenant for two rent cycles.[22]  Whalen also never expressly rejected the Consent to Assignment of Lease form.

15.  The parties' conduct after the dispute with IHFC arose is less persuasive evidence of their understanding of the Purchase Agreement at the time it was drafted.  Whalen relies heavily on the undated addendum to the Purchase Agreement that explicitly excludes the IHFC Lease.  (Def. Ex. DX24.)  But as Whalen must concede, it was not executed until after this litigation commenced.  By then, APA Marketing, Inc., which was essentially dissolved and judgment-proof, had little incentive to avoid the obligation, while Whalen, Coscarelli, and Schwerin were incentivized to assign the financial obligation to APA Marketing, Inc.  The court therefore does not find the addendum particularly persuasive.  See Sterling, 152 P.3d at 429 ("[W]hen

---

[22] Whalen's arguments that it did not act like, or was not treated as, a tenant because IHFC did not put Whalen's name on building signage or give Whalen keys are meritless.  Whalen never asked for either, which is understandable given that Whalen was still marketing its products under the name "APA Marketing" and that the two people who would have originally been issued keys for the showroom space for APA Marketing, Inc. - Schwerin and Coscarelli - worked for Whalen.

a contract is ambiguous or uncertain the practical construction placed upon it by the parties *before any controversy arises as to its meaning* affords one of the most reliable means of determining the intent of the parties." (emphasis added)); <u>City of Hope</u>, 181 P.3d at 155 ("A party's conduct *occurring between execution of the contract and a dispute about the meaning of the contract's terms* may reveal what the parties understood and intended those terms to mean." (emphasis added)).

16. Ultimately, the purpose of inquiring into the parties' conduct and the surrounding circumstances is to inform the understanding of what the parties intended the contract to mean *at the time it was written*, not what the parties thought afterward. The failure to mention the IHFC Lease in any way in the Purchase Agreement, as well as the divergent conduct of the parties after the contract was written, indicates that the parties most likely simply overlooked the IHFC Lease at the time of drafting. IHFC carries the burden of proof to demonstrate that the Purchase Agreement transferred responsibility for the Lease to Whalen. On this record, the court finds that IHFC has failed to establish by a preponderance of the evidence that the parties to the Purchase Agreement intended to transfer the Lease

and its obligations at the time.[23]   Therefore, the court turns to IHFC's other theories of liability in the case.

**B.   Whalen's Responsibility for the Lease**

### 1.   Mere continuation/*de facto* merger

17.   Even if Whalen did not assume the Lease in the Purchase Agreement, IHFC contends, Whalen assumed responsibility for it under the "mere continuation" or *de facto* merger doctrines.   IHFC asserts that the purchase of all or substantially all of APA Marketing, Inc.'s assets, including its brand names and goodwill; the immediate employment of Schwerin and Coscarelli, APA Marketing, Inc.'s sole owners; the exhibition of Whalen's products in the showroom leased to APA Marketing, Inc.; and the payment of APA Marketing, Inc.'s rent for two cycles indicate that Whalen is a mere continuation of APA Marketing, Inc., or that Whalen *de facto* merged with it. (Doc. 3 ¶¶ 22–23.)

---

[23] The court reaches this conclusion nevertheless taking into account the general rule that ambiguities in a contract are to be construed against the drafter.   <u>Victoria v. Superior Court</u>, 710 P.2d 833, 839 (Cal. 1985).   At trial, it was revealed that Whalen drafted the Purchase Agreement.   But "[t]he rule of resolving ambiguities against the drafter does not serve as a mere tie breaker; it rests upon fundamental considerations of policy."   <u>Goddard v. S. Bay Union High Sch. Dist.</u>, 144 Cal. Rptr. 701, 706 (Ct. App. 1978) (internal quotation marks omitted).   Those policy considerations, which are most strongly present in cases of form or adhesion contracts, do not present themselves here sufficient to warrant a finding in IHFC's favor.   <u>See, e.g.</u>, <u>Victoria</u>, 710 P.2d at 835; <u>Oceanside 84, Ltd. v. Fid. Fed. Bank</u>, 66 Cal. Rptr. 2d 487, 492 (Ct. App. 1997).

18.   Because   the   Purchase   Agreement   is   governed   by
California   law   and   the   two   companies   involved   are   both
California   corporations,   that   state's   law   governs   the   question
of   mere   continuation   or   *de facto*   merger.    Under   California   law,
a   corporation   purchasing   the   principal   assets   of   another   does
not   typically   assume   its   liabilities   as   well,   but   it   may   in
certain   situations,   including   where   the   purchaser   is   a   mere
continuation   of   the   seller   and   where   the   transaction   amounts   to
a   *de facto*   merger.    <u>Ray v. Alad Corp.</u>,   560   P.2d   3,   7   (Cal.   1977)
(describing   four   exceptions   to   the   general   rule   against
successor   liability:   (1)   express   or   implied   assumption   of
liability,   (2)   *de facto*   merger,   (3)   mere   continuation,   and   (4)
fraud).[24]

19.   A   *de facto*   merger   occurs   "where   one   corporation   takes
all   of   another's   assets   without   providing   *any consideration*   that
could   be   made   available   to   meet   claims   of   the   other's   creditors
or   where   the   consideration   consists   wholly   of   shares   of   the
purchaser's   stock   .   .   ."    <u>Id.</u>   (emphasis   added)   (citation
omitted).    In   the   present   case,   Whalen   provided   $3.5   million   in
consideration   for   APA   Marketing,   Inc.'s   assets,   which   could   have
been   made   available   to   its   creditors   and   indeed   was   made
available   to   some,   though   perhaps   not   all,   of   its   creditors.

---

[24] There is some authority for collapsing the *de facto* merger inquiry
into the mere continuation inquiry, but in the interest of clarity and
thoroughness, the court will address each in turn.  <u>See</u> <u>Franklin v.</u>
<u>USX Corp.</u>, 105 Cal. Rptr. 2d 11, 17 n.6 (Ct. App. 2001).

Whalen did not engage in a *de facto* merger with APA Marketing, Inc.

20. A purchasing company is the mere continuation of another company "only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." Id. As previously stated, Whalen provided $3.5 million in consideration, and IHFC neither produced evidence of the value of the purchased assets nor argued that the purchase price was inadequate. So, the first factor is not present. Although there is some continuity of leadership between the companies, IHFC did not prove by a preponderance of the evidence that Schwerin and Coscarelli were "officers, directors, or stockholders" of Whalen. They held titles of "president" and "vice-president," respectively, of a Whalen division, but the testimony indicated that these were ceremonial titles and that both men were in fact only employees. There was also no evidence that they owned any stock of Whalen. Thus, there is insufficient evidence to conclude that they were "officers, directors, or stockholders" within the meaning of California law.

21.    Under California law, therefore, Whalen was not the mere continuation of, nor did Whalen's Purchase Agreement effect a *de facto* merger with, APA Marketing, Inc.    Consequently, neither theory can serve as a basis for holding Whalen liable under the Lease.

### 2.    Estoppel

22.    Although Whalen did not assume the Lease through mere continuation, *de facto* merger, or the Purchase Agreement, it may be estopped from disclaiming responsibility under the Lease. North Carolina law governs this question of estoppel.[25]

23.    Estoppel is an equitable doctrine with different branches.    <u>Whitacre P'ship v. Biosignia, Inc.</u>, 591 S.E.2d 870 (N.C. 2004) (describing each branch of estoppel in North Carolina law).    Under quasi-estoppel, also known as estoppel by acceptance of benefits, "a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction or instrument."    <u>Id.</u> at 881–82. Detrimental reliance need not be pleaded or proven.    <u>Id.</u> at 882. The "essential purpose of quasi-estoppel . . . is to prevent a

---

[25] "A federal court, sitting in North Carolina in a diversity case, must apply the law as announced by the highest court of that state or, if the law is unclear, as it appears the highest court of that state would rule." <u>Brendle v. Gen. Tire & Rubber Co.</u>, 505 F.2d 243, 245 (4th Cir. 1974).    Only if a fair reading of the North Carolina Supreme Court's cases "proves unenlightening . . . should a federal court seek guidance from an intermediate state court." <u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1002 (4th Cir. 1998).

party from benefitting by taking two clearly inconsistent positions." Id. (quoting B & F Slosman v. Sonopress, Inc., 557 S.E.2d 176, 181 (N.C. App. 2001)).

24. North Carolina law does not clearly indicate how much a party needs to know about that "transaction or instrument" in order to accept or ratify it. Notice to the party to be estopped is not an issue in most cases, as the party in question already has access to the written instrument. See, e.g., Brooks v. Hackney, 404 S.E.2d 854 (N.C. 1991). North Carolina law does emphasize, however, the "inherent flexibility" of the doctrine of quasi-estoppel and the overriding focus on fairness to the parties. Whitacre, 591 S.E.2d at 882. Fairness indicates that the party to be estopped must at least know the material facts of the agreement to which he or she is agreeing.[26] In the statute of frauds context, the material facts or "essential elements" of a lease are (1) the identity of the lessor and lessee, (2) the property to be leased, (3) the term of the lease, and (4) the amount of rent to be paid. See Purchase

---

[26] Other states' law on quasi-estoppel indicates as much. Texas, for example, requires that "before the acceptance of benefits can trigger estoppel, it must be shown that the benefits were accepted with knowledge of all the material facts." Anadarko Petroleum Corp. v. Thompson, 60 S.W.3d 134, 142 (Tex. App. 2000), rev'd on other grounds, 94 S.W.3d 550 (Tex. 2002). Other states require "full knowledge" for quasi-estoppel to apply. See, e.g., Dayton Sec. Assoc. v. Avutu, 664 N.E.2d 954, 957 (Ohio Ct. App. 1995) ("For an estoppel by acceptance of benefits to arise, the party accepting such benefits must do so with full knowledge of the facts and his rights."); Maynerich v. Little Bear Enter., Inc., 485 P.2d 984, 986 (N.M. Ct. App. 1971).

<u>Nursery, Inc. v. Edgerton</u>, 568 S.E.2d 904, 907 (N.C. Ct. App. 2002).

25. When the "transaction or instrument" at issue is a lease, North Carolina law requires that the "acceptance of benefits" be something more than occupying the space and paying rent at regular intervals. See <u>Raleigh Flex Owner I, LLC v. MarketSmart Interactive, Inc.</u>, No. 1:09CV699, 2011 WL 923356, at *10-11 (M.D.N.C. Mar. 7, 2011).[27] The party to be estopped must have enjoyed some right or benefit available only to a leased tenant, rather than merely a periodic tenant, before disclaiming the validity of the lease. <u>Id.</u> (noting, for example, that if the plaintiff tried to evict the defendant from the property at the end of one of the intervals of the periodic tenancy and defendant had refused to vacate "based on a claim of right under the lease, [p]laintiff properly could assert that [defendant] derived a benefit from the [l]ease (i.e., the benefit of remaining as a tenant without [p]laintiff's consent while [p]laintiff pursued [defendant's] eviction).") Even if the tenant's benefit from the lease is minimal, and even if the lease is invalid, regular payments under color of a lease that "effectively reserve the use of the land," so that the owners "would reasonably have believed that they were precluded from

---

[27] As an unpublished opinion by a United States Magistrate Judge, <u>Raleigh Flex</u> is not binding on this court. However, the court finds its analysis of North Carolina law helpful.

selling or renting the property to someone else" create estoppel by acceptance of benefits. <u>Brooks</u>, 404 S.E.2d at 859.

26.  In the present case, Ken Whalen, on behalf of Whalen, told IHFC that Whalen would "take care of" APA Marketing, Inc.'s rent obligation.  He did so after Loney informed him of the term of the Lease, the rent obligation, and due dates.  Indeed, Whalen knew the amount of the rent obligation because it issued checks directly to IHFC for the balance of the rent for the October 2008 market and in November 2008 issued a check directly to IHFC for the full rent owed on the April 2009 market.  Whalen knew the material facts of the Lease: the identity of the lessor, the property leased, the term, and the amount due. Having the right to accept or reject the Lease, Whalen accepted it.  To be sure, Whalen also never informed Loney or anyone at IHFC that it would *not* sign the "Consent to Assignment of Lease" form, which would have put IHFC on notice that Whalen was not accepting the Lease.  Instead, Whalen agreed to "take care of" the rent obligation, allowed the consent form to be sent, and made payments.

27.  Whalen then accepted benefits under the Lease. Acceptance of benefits does not have to be affirmative; it may be acquiescence to benefits.  <u>See</u> <u>Whitacre</u>, 591 S.E.2d at 882 (quoting <u>Godley v. Cnty. of Pitt</u>, 293 S.E.2d 167, 170 (N.C. 1982)).  Here, Whalen did more than simply occupy the premises

36

and pay rent. Whalen accepted utilities, including "heat, electricity, air conditioning, and elevator service," which IHFC paid according to the terms of the Lease for thirty days before and fourteen days after each furniture market. (Pl. Ex. 1 § 9.0.) Whalen accepted those benefits not just for the October 2008 market, but for the April 2009 market as well.

28. In addition, Whalen affirmatively requested and was granted access to the IHFC building and the Lease space in July 2009 for a private showing to its customer, Macy's, at time when the building was closed between markets. IHFC arranged for the building and showroom to be opened and for the utilities to be turned on. According to Loney, these were rights accorded only tenants, and if IHFC had known that Whalen was merely using the space temporarily or did not consider itself a leased tenant, IHFC would not have opened the space or allowed the private showing. The court finds this testimony credible. Whalen therefore accepted the benefits of non-market access to the showroom and the landlord's facilitation of access to utilities -- benefits available only to leased tenants -- in order to utilize the space during the off-season. Having accepted the IHFC Lease and the benefits under it, Whalen is therefore estopped from denying liability for its corresponding obligations.

29. Whalen argues that quasi-estoppel is inapplicable because it signed no written agreement and was in negotiations for space at the IHFC showroom.[28] Whalen therefore asserts that this case is more similar to Slosman than Brooks. In Slosman, a prospective tenant approached a landlord about leasing space in a warehousing and manufacturing plant. 557 S.E.2d at 178. The tenant began occupying part of the space and paying an agreed-upon rent while negotiating the terms of a multi-year written lease, yet a written lease was never agreed to. Id. at 178-79. Given these facts, the court found quasi-estoppel inapplicable because the tenant had never benefitted from taking inconsistent

---

[28] Whalen also argues that this theory of liability was not raised in IHFC's complaint. (Doc. 54 at 130 (mentioning "promissory estoppel" but presumably intending that argument to extend to "equitable" and "quasi-estoppel").) Yet, trial courts have significant discretion to allow amendment, especially when, as here, the character of the litigation is unchanged and the parties knew of and argued the theory prior to and during trial. Cf. Deasy v. Hill, 833 F.2d 38, 42 (4th Cir. 1987) (refusing to allow amendment when doing so would "alter substantially the nature of the lawsuit" and would require proof "of an entirely different character" than had previously been required); U.S. ex rel. Bennett v. Genetics & IVF Institute, Inc., 199 F.3d 1328 (4th Cir. 1999) (unpublished) (holding that, despite district court's "wide discretion" on this issue, plaintiff could not add new theory that was in fact "an entirely different claim" involving "new facts, new legal theories and probably new discovery").

Here, estoppel is based on the same facts as the theories alleged in the complaint; no new discovery would be required to defend against it. Furthermore, both parties argued estoppel-based theories in their trial briefs; the fact that both briefs were submitted on the same day indicates that estoppel was a subject of dispute even before the trial briefs were submitted. (Docs. 45, 47.) Whalen also argued the merits of estoppel-based theories at length at trial without any objections and did not raise its objection until the final day of trial. Even when it finally objected, Whalen did not argue it had suffered any unfair prejudice and, indeed, the court can find none. This final judgment grants the relief to which IHFC is entitled, pursuant to Federal Rule of Civil Procedure 54(c).

positions.  Id. at 181.  The tenant merely occupied the space and paid an agreed upon rent at intervals – the definition of a periodic tenancy – all while negotiating the terms of occupancy. See id.; Kent v. Humphries, 281 S.E.2d 43 (N.C. 1981).

30.  In contrast, Whalen seeks to benefit from taking two inconsistent positions, but the law of quasi-estoppel prevents it from doing so.  See Whitacre, 591 S.E.2d at 882.  Unlike the tenant in Slosman and unlike any periodic tenant, Whalen received benefits under the Lease to which only a *leased* tenant was entitled.  See Raleigh Flex, 2011 WL 923356, at *10-11.  Now it disclaims any responsibility under the Lease, including making the rent payments.

31.  Furthermore, the fact that Whalen was in negotiations with IHFC to lease additional, *other* showroom space does not alter Whalen's responsibility for the showroom space it was already occupying.  The key question is whether the tenant accepted the benefits of an agreement for the space it was occupying.  Like Whalen, the Slosman tenant was in negotiations to lease more space.  Unlike Whalen, the Slosman tenant never accepted benefits from that agreement (i.e., never accepted benefits over and above simply occupying the space and paying rent).  That is the essential point of quasi-estoppel and the critical fact distinguishing this case from Slosman.

39

### 3.   Consent to assignment

32.   Whalen argues that it cannot be held to the terms of the IHFC Lease because of the provision barring assignment without IHFC's written consent.[29]  The IHFC Lease does indeed bar any transfer (by assignment or sublease) without IHFC's prior written consent.  (Pl. Ex. 1 § 5.1.)  It defines assignment to include a change of ownership.  (Id. § 5.3.)  Whalen argues that, because IHFC never gave its prior written consent to the assignment of the Lease, Whalen never effectively assumed it.

33.   As IHFC points out, this Lease provision is for IHFC's benefit and may be waived by it.  Waiver of a lease provision can be by a written or oral statement, but it may also occur by conduct.  For example, a landlord can, by accepting rent, waive a lease term forbidding assignment without its consent.  See Fairchild Realty, Co. v. Spiegel, Inc., 98 S.E.2d 871, 878 (N.C. 1957).  Here, IHFC accepted two rent checks directly from Whalen, thus electing to waive its prior written consent to the assignment.  IHFC's desire to obtain documentation to "finalize" the Lease assignment (Def. Ex. DX37, DX38), moreover, does not retract or vitiate that waiver right.

34.   IHFC routinely waived lease provisions, both by conduct and by oral permission.  For example, IHFC waived the

---

[29] Because this argument is based on the IHFC lease, which is a lease for real property in North Carolina and includes a North Carolina choice of law clause, North Carolina law governs.

Lease provision requiring a written sublease for Ultimate to occupy APA Marketing, Inc.'s space. It also regularly waived the non-compete provision, which requires tenants not to show the same brands they are showing at IHFC at any other showroom within a five-mile radius. (Pl. Ex. 1 § 4.4.) There is no reason IHFC could not waive the Lease provision requiring prior written consent to assignment, and it clearly did so by accepting rent checks from Whalen and providing Whalen Lease benefits such as access during an off-market season and arranging for utilities.

### 4. Statute of frauds

35. Finally, Whalen argues that the statute of frauds bars an unwritten assumption of the Lease because the term of the leasehold was for more than three years. Again, because this argument is based on the IHFC lease, North Carolina law governs. The North Carolina statute of frauds requires that the conveyance of an interest in real property be in writing and signed by the party to be charged if the term of the interest is for more than three years. N.C. Gen. Stat. § 22-2. The writing must include all the essential elements of the contract. Powell v. City of Newton, 684 S.E.2d 55, 58 (N.C. Ct. App. 2009) (citation omitted).

36. At the time APA Marketing, Inc., conveyed its interest in the IHFC Lease to Whalen, more than three years remained on

the Lease term.   The Purchase Agreement does not satisfy the writing requirement because it does not contain the essential terms of the Lease assignment; indeed, it does not even mention the IHFC Lease.   The Lease does not satisfy the writing requirement because, although it contains all the essential terms, was not signed by Whalen, the party to be charged.   There is therefore no writing that satisfies the statute of frauds.

37.   Yet, as IHFC contends, Whalen is estopped from asserting a statute of frauds defense.   Whalen accepted the balance of the IHFC Lease, which contained all the essential elements of the agreement, and then accepted benefits under it. It cannot now assert that the IHFC Lease was invalid or inapplicable to Whalen because Whalen had not signed it, after having accepted the Lease benefits for almost a year.  See supra Part II, ¶¶ 22–31; Brooks, 404 S.E.2d at 858-59 (applying estoppel by acceptance of benefits to overcome statute of frauds defense); cf. Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C., Inc., 477 S.E.2d 262, 265 (N.C. Ct. App. 1996) (holding that quasi-estoppel did not bar statute of frauds defense where tenant had not accepted benefits under the lease).

38.   The court has considered all of Whalen's other arguments, including a defense of laches, and finds them to be without merit.

42

39. Because Whalen is responsible for the Lease under a quasi-estoppel theory, the court need not reach IHFC's alternative arguments regarding equitable estoppel (i.e., estoppel by detrimental reliance) or periodic tenancy.[30]

### 5. Remedy as to Whalen

40. Since IHFC's recovery is based on a theory of quasi-estoppel, "the remedy granted for breach is to be limited as justice requires," as it is for estoppel generally. Wachovia Bank & Trust Co., N.A. v. Rubish, 293 S.E.2d 749, 759 (N.C. 1982) (quoting Restatement (Second) of Contracts § 139 (1981)) (discussing promissory estoppel). After all, "[t]he doctrine of estoppel rests upon principles of equity and is designed to aid the law in the administration of justice when without its intervention injustice would result." Slosman, 557 S.E.2d at 179 (quoting Thompson v. Soles, 263 S.E.2d 599, 602 (N.C. 1980)).

---

[30] During Whalen's oral Rule 52(c) motion at the close IHFC's evidence, Whalen objected to IHFC pursuing a theory of recovery based on periodic tenancy because that theory of recovery did not appear in IHFC's original complaint. This objection was Whalen's first on the subject. IHFC then moved under Rule 15(b) to amend its pleadings to include periodic tenancy. Periodic tenancy was discussed in both parties' trial briefs, at the September 26, 2013 settlement conference, and at trial. All the facts necessary to establish a periodic tenancy and to defend against a claim of periodic tenancy were presented at trial. However, because the court does not reach the issue of periodic tenancy, IHFC's motion is moot. In any case, the most appropriate rule under which to address the issue of periodic tenancy may be Rule 54(c), rather than Rule 15(b). See Pinkley, Inc. v. City of Frederick, Md., 191 F.3d 394, 400-01 (4th Cir. 1999).

41. Justice requires that Whalen be held accountable for the material terms of the Lease: rent owed over the balance of the Lease. The total rent owed is $645,893.79. (See Pl. Ex. 11.) IHFC was able to mitigate $473,423.28 of its loss by leasing the showroom to Red Dog, Ultimate,[31] Heritage Brands, and Intercon. (See id.)[32] Whalen is therefore liable to IHFC for $172,470.51.

42. IHFC seeks recovery of interest and attorneys' fees. But remedies based on specific Lease provisions that were not shown to have been discussed with Ken Whalen, such as interest and reasonable attorneys' fees and expenses, are unavailable to IHFC because Whalen was not on notice of them.[33] See supra Part

---

[31] At trial, Whalen argued that the amount recovered from Ultimate was unfairly calculated because IHFC built a "step factor" into the lease, whereby Ultimate paid less per square foot for its first years of the lease than it did for its last years. See supra Part I, ¶ 37. Whalen argued that the amount should be averaged across the five years of the lease, resulting in a higher sum that IHFC collected in mitigation. The court is not persuaded. IHFC had little leverage in negotiating those leases because of the necessity of finding paying tenants quickly. By all appearances, IHFC negotiated and signed those leases in good faith and used its best efforts to mitigate the damage.

[32] Thomas testified at trial that he made a mathematical error in calculating the amount recovered from Heritage Brands. The total amount is $71,250, not $71,173.05.

[33] There is an argument that Whalen knew more about the Lease than it was willing to acknowledge. After Ken Whalen told Loney that Whalen would "take care of" the payments under the IHFC Lease, IHFC, apparently believing that Whalen purchased APA Marketing, Inc. (and not just its assets), continued to send rent invoices to APA Marketing, Inc.'s address. Coscarelli and Schwerin were hired by Whalen as the key officers of its division selling the APA Marketing line of products, they occupied the Lease space on behalf of Whalen, and they personally knew the terms of the Lease because of their work

44

II, ¶ 24.    Therefore, this court finds that an equitable recovery of $172,470.51 is appropriate for IHFC from Whalen.

### C.    APA Marketing, Inc.

43.  IHFC has moved for a default judgment against APA Marketing, Inc., which had notice of the trial but elected not to appear.  (Doc. 55.)  IHFC has proven APA Marketing, Inc.'s liability under the Lease, and the court will grant the motion. FED. R. CIV. P. 55(b)(2).  APA Marketing, Inc., is responsible for all damages under the Lease, including fees, costs, and interest pursuant to the Lease provisions.  That amount is $172,470.51,[34] plus a late fee (§ 12.3) of $8,623.53, plus interest at the contract rate (§ 16.0(h)) of one and one-half percent per month from May 1, 2009, until judgment, plus reasonable attorneys' fees due under the Lease (§ 16.0(i)) in the amount of $25,870.57, calculated as fifteen percent (15%) of the

---

at APA Marketing, Inc.  Against this background, Whalen responded to the invoices mailed to APA Marketing, Inc., by issuing checks drawn from Whalen's corporate bank account on not one, but two occasions, covering a year's occupancy.  IHFC might have argued that Whalen knew all the terms of the Lease insofar as Coscarelli, a division vice president of Whalen, had personally signed it.  See Jay Grp., Ltd. v. Glasgow, 534 S.E.2d 233, 237 (N.C. Ct. App. 2000) ("Knowledge of the president or agent of a corporation is imputed to the corporation itself.").  But IHFC has not contended that Schwerin's and Coscarelli's knowledge can be imputed to Whalen under these circumstances, and the court need not decide that legal question.  The court does find that at a minimum equity favors holding Whalen to the material terms of the Lease.

[34] IHFC requested $172,547 in damages (Doc. 55), but that amount does not take into account Thomas' mathematical error.  See supra note 32. The rest of IHFC's figures are correspondingly inaccurate, as they are based on a percentage of the damages.

outstanding principal balance pursuant to N.C. Gen. Stat. § 6-21.2(2),[35] and costs.

44.  The evidence presented at trial demonstrated that APA Marketing, Inc., was dissolved and is unlikely to be able to satisfy any judgment.  In any event, IHFC is not entitled to a double recovery, and APA Marketing, Inc., and Whalen shall be jointly and severally liable for Whalen's equitable share of the damages: $172,470.51.  APA Marketing, Inc., shall be liable for its damages in excess of Whalen's liability.

## III. CONCLUSION

For the reasons stated, the court finds that IHFC is entitled to default judgment against APA Marketing, Inc., for the unmitigated balance due under the Lease, plus late fees, interest, attorneys' fees, and costs.  The court further finds that the Purchase Agreement did not transfer the IHFC Lease from APA Marketing, Inc., to Whalen, nor is Whalen liable for the Lease on theories of mere continuation or *de facto* merger. However, Whalen, by its conduct, nevertheless assumed responsibility for the material terms of the Lease, is liable for the unmitigated damages of $172,470.51 under the doctrine of quasi-estoppel, and is barred by the doctrine from asserting a defense based on the statute of frauds.

---

[35]  IHFC gave proper notice in the complaint for its attorneys' fee request.  See id. § 6-21.2(5); (Doc. 3 ¶ 17).

IT IS THEREFORE ORDERED that IHFC shall have and recover of APA Marketing, Inc., $172,470.51, plus a late fee of $8,623.53, plus interest at the contract rate of one and one-half percent per month from May 1, 2009, until the date of Judgment, plus reasonable attorneys' fees of $25,870.57 pursuant to N.C. Gen. Stat. § 6-21.2(2), and costs.

IT IS FURTHER ORDERED that Whalen shall be jointly and severally liable for, and IHFC shall have and recover of Whalen, $172,470.51, plus costs, for use of the Lease space on the basis of quasi-estoppel.

A separate Judgment will issue.


                                    /s/   Thomas D. Schroeder
                              United States District Judge

January 14, 2014